| | |
|---|---|
| DANIELLE D. HIRE,<br><br>      Plaintiff,<br><br>  vs.<br><br>CAROLYN W. COLVIN,<br>Acting Commissioner of Social<br>Security,<br><br>      Defendant. | CIV. 14-5007-JLV<br><br><br>ORDER |

## INTRODUCTION

Plaintiff Danielle Hire filed a complaint appealing from an administrative law judge's ("ALJ") decision denying disability insurance benefits.   (Docket 1). Defendant denies plaintiff is entitled to benefits.   (Docket 9).   The court issued a briefing schedule requiring the parties to file a joint statement of material facts ("JSMF").   (Docket 11).   The parties filed their JSMF.   (Docket 14).   For the reasons stated below, plaintiff's motion to reverse the decision of the Commissioner (Docket 19) is granted.

## FACTUAL AND PROCEDURAL HISTORY

The parties JSMF (Docket 14) is incorporated by reference.   Further recitation of salient facts is incorporated in the discussion section of this order.

On October 6, 2010, Ms. Hire filed applications for disability insurance benefits and supplemental social security income alleging an onset of disability date of March 28, 2010.   Id. ¶ 2.   On November 29, 2012, the ALJ issued a

decision finding Ms. Hire was not disabled.   Id. ¶ 16; see also Administrative

Record at pp. 12-23 (hereinafter "AR at p. ____").   On January 13, 2014, the

Appeals Council denied Ms. Hire's request for review.   (Docket 14 ¶ 16).   The

ALJ's decision constitutes the final decision of the Commissioner of the Social

Security Administration.   It is from this decision which Ms. Hire timely appeals.

The issue before the court is whether the ALJ's decision of November 29,

2012, that Ms. Hire was not "under a disability, as defined in the Social Security

Act, from March 28, 2010 through [November 29, 2012]" is supported by the

substantial evidence in the record as a whole.   (AR at p. 12); see also Howard v.

Massanari, 255 F.3d 577, 580 (8th Cir. 2001) ("By statute, the findings of the

Commissioner of Social Security as to any fact, if supported by substantial

evidence, shall be conclusive.") (internal quotation marks and brackets omitted)

(citing 42 U.S.C. § 405(g)).

## STANDARD OF REVIEW

The Commissioner's findings must be upheld if they are supported by

substantial evidence in the record as a whole.   42 U.S.C. § 405(g); Choate v.

Barnhart, 457 F.3d 865, 869 (8th Cir. 2006); Howard, 255 F.3d at 580.   The

court reviews the Commissioner's decision to determine if an error of law was

committed.   Smith v. Sullivan, 982 F.2d 308, 311 (8th Cir. 1992).   "Substantial

evidence is less than a preponderance, but is enough that a reasonable mind

would find it adequate to support the Commissioner's conclusion."   Cox v.

Barnhart, 471 F.3d 902, 906 (8th Cir. 2006) (internal citation and quotation marks omitted).

The review of a decision to deny benefits is "more than an examination of the record for the existence of substantial evidence in support of the Commissioner's decision . . . [the court must also] take into account whatever in the record fairly detracts from that decision."  Reed v. Barnhart, 399 F.3d 917, 920 (8th Cir. 2005) (quoting Haley v. Massanari, 258 F.3d 742, 747 (8th Cir. 2001)).

It is not the role of the court to re-weigh the evidence and, even if this court would decide the case differently, it cannot reverse the Commissioner's decision if that decision is supported by good reason and is based on substantial evidence.  Guilliams v. Barnhart, 393 F.3d 798, 801 (8th Cir. 2005).  A reviewing court may not reverse the Commissioner's decision " 'merely because substantial evidence would have supported an opposite decision.' "  Reed, 399 F.3d at 920 (quoting Shannon v. Chater, 54 F.3d 484, 486 (8th Cir. 1995)).  Issues of law are reviewed de novo with deference given to the Commissioner's construction of the Social Security Act.  See Smith, 982 F.2d at 311.

The Social Security Administration established a five-step sequential evaluation process for determining whether an individual is disabled. 20 CFR § 404.1520(a)(4).  If the ALJ determines a claimant is not disabled at any step of the process, the evaluation does not proceed to the next step as the claimant is not disabled.  Id.  The five-step sequential evaluation process is:

(1) whether the claimant is presently engaged in a "substantial gainful activity"; (2) whether the claimant has a severe impairment—one that significantly limits the claimant's physical or mental ability to perform basic work activities; (3) whether the claimant has an impairment that meets or equals a presumptively disabling impairment listed in the regulations (if so, the claimant is disabled without regard to age, education, and work experience); (4) whether the claimant has the residual functional capacity to perform . . . past relevant work; and (5) if the claimant cannot perform the past work, the burden shifts to the Commissioner to prove there are other jobs in the national economy the claimant can perform.

Baker v. Apfel, 159 F.3d 1140, 1143-44 (8th Cir. 1998). The ALJ applied the five-step sequential evaluation required by the Social Security Administration regulations. (AR at pp. 12-14).

**STEP ONE**

At step one, the ALJ determined Ms. Hire had not been engaged in substantial gainful activity since March 28, 2010. (Docket 14 ¶ 67).

**STEP TWO**

"At the second step, [the agency] consider[s] the medical severity of your impairment(s)." 20 CFR § 404.1520(a)(4)(ii). "It is the claimant's burden to establish that [her] impairment or combination of impairments are severe." Kirby v. Astrue, 500 F.3d 705, 707 (8th Cir. 2007). A severe impairment is defined as one which significantly limits a physical or mental ability to do basic work activities. 20 CFR § 1521. An impairment is not severe, however, if it "amounts to only a slight abnormality that would not significantly limit the claimant's physical or mental ability to do basic work activities." Kirby, 500 F.3d at 707. "If the impairment would have no more than a minimal effect on

4

the claimant's ability to work, then it does not satisfy the requirement of step two." Id. (citation omitted). Additionally, the impairment must have lasted at least twelve months or be expected to result in death. See 20 CFR § 404.1509.

The ALJ identified Ms. Hire suffered from the following severe impairments: "history of bilateral tibia/fibula and left distal radius fractures with surgical repair, polyarthralgias,[1] borderline intellectual function, depression, and anxiety/posttraumatic stress disorder." (Docket 14 ¶ 68). Ms. Hire objects to the ALJ limiting her severe impairments to these four conditions. (Docket 20 at pp. 24-27). She argues the ALJ should have included the following additional severe impairments:

1. Persistent objective abnormalities to Ms. Hire's dominant left forearm and hand, considering "the nature or severity of Hire's tenosynovitis, recurrent marked adhesions affecting tendons, muscles and nerve, neuromas, and amputation of the sensory branch of the left radial nerve with indications for additional surgery." Id. at p. 25;

2. Bilateral ankle impairments, considering Ms. Hire "had 'chronic' grade 3 instability of ligaments in both ankles." Id.;

3. Obesity. Id.;

4. Reading, mathematics and written expressions disorders. Id. at p. 26; and

5. Brain abnormalities of "multiple bilateral punctate hemorrhagic foci." Id.

---

[1]"Polyarthralgia is defined as aches in the joints, joint pains, arthralgia of multiple joints, and multiple joint pain. Polyarthritis is the word usually used to describe pain affecting five or more joints . . . ." Polyarthralgia Joint Pain and Fibromyalgia - Disabled World. www.disabled-world.com/health/orthopedics/polyarthralgia.php.

Ms. Hire asserts "[i]t is fundamental in social security disability cases that combined impairments produce greater disability than each impairment considered separately." Id. (referencing 42 U.S.C. § 423(d)(2)(B)).[2] She submits the prejudice suffered during the step two analyses is that the "[f]ailure to identify severe impairments, and their combined effect, negatively influenced the ALJ's formulation of 'the most important issue'—residual functional capacity." Id. She asserts "[t]he ALJ's failure to recognize Hire's multiple mental and physical severe impairments undermined the entire sequential evaluation . . . ." Id. at p. 27.

The Commissioner counters that "the ALJ's failure to find that a particular impairment was 'severe' does not constitute reversible error so long as the ALJ found that at least one other impairment was severe." (Docket 21 at p. 6) (referencing 20 CFR § 404.1520(a)(4)(ii)). The Commissioner argues any error at step two was "harmless" because the ALJ proceeded to step three. Id. (citing Carpenter v. Astrue, 537 F.3d 1264, 1266 (10th Cir. 2008) (referencing 20 CFR § 404.1523)[3] (other citations omitted). The essence of the Commissioner's argument is that Ms. Hire's claim seeking incorporation of additional severe

_____

[2]"If the Commissioner . . . does find a medically severe combination of impairments, the combined impact of the impairments shall be considered throughout the disability determination process." 42 U.S.C. § 423(d)(2)(B).

[3]The ALJ is required to "consider the combined effect of all of your impairments without regard to whether any such impairment, if considered separately, would be of sufficient severity. If we do find a medically severe combination of impairments, the combined impact of the impairments will be considered throughout the disability determination process." 20 CFR § 404.1523.

impairments "is irrelevant as the ALJ found that she had severe impairments and proceeded through the sequential evaluation . . . ." <u>Id.</u> at p. 7.

Each of Ms. Hire's claims will be separately addressed.

<u>LEFT FOREARM AND HAND</u>

Ms. Hire was injured in an automobile collision on October 17, 2005. (Docket 14 ¶ 139). In addition to other injuries, Ms. Hire suffered fractures of both legs and "an oblique intrarticular fracture along the radial aspect of the distal radius" of her left wrist. <u>Id.</u> ¶ 144 & glossary of medical terms at pp. 107-08. Her left wrist was surgically repaired on October 19, 2005. <u>Id.</u> ¶ 151.

On May 10, 2010, x-rays noted "[e]arly degenerative arthritis in the radiocarpal joint" of the left wrist and "arthritic uptake to the radiocarpal joint" of the left forearm. <u>Id.</u> ¶ 224. On July 13, 2010, Dr. Bellah, a board certified orthopedic surgeon, surgically removed the hardware [two screws] from Ms. Hire's left wrist. <u>Id.</u> ¶¶ 236 & 313. Removing the screws was difficult. <u>Id.</u> ¶ 236. "Marked adhesions encompassed the extensor pollicis brevis and abductor pollicis longus tendons." <u>Id.</u>; <u>see</u> <u>also</u> glossary of medical terms at pp. 109-10. Dr. Bellah took down the adhesions and "thought there was relatively good motion of the thumb." (Docket 14 ¶ 236). On July 22, 2010, Dr. Bellah noted Ms. Hire "had a significant amount of pain and discomfort, and some loss of motion to the thumb. . . ." <u>Id.</u> ¶ 238. "She could barely touch her thumb to

the mid portion of her long finger, and extension was a bit limited by pain as well. Wrist motion showed 20 degrees of dorsal and palmar flexion." Id.

On September 30, 2010, Dr. Bellah operated a second time on Ms. Hire's left wrist and hand. Id. ¶ 247. His operative notes indicated "[t]he extensor pollicis brevis actually had the distal end of the tendon adhesed to bone and had no proximal extension. Another part of the tendon was also adhesed. Both ends were mobilized and repaired. The abductor pollicis longus tendon was also adhesed, but intact, and could be freed up adequately. The sensory branch of the radial nerve coursed through the wound and was densely adhesed to scar tissue but could be mobilized adequately." Id. ¶ 249 (internal quotation marks omitted).

On October 21, 2010, Dr. Bellah noted "I think there is a bit of a way to go to see if we can get her to heal this lesion with the extensor tendon of the thumb without re-forming adhesions that were very prominent in the first dorsal compartment. There is also a possibility she may require a neurectomy of the radial nerve in order to relieve her of the dysesthesias[4] and burning pain that she has in the fingers." Id. ¶ 255. During a November 5, 2010, examination Dr. Bellah noted "[s]he could actively flex the interphalangeal joint of the thumb quite well. Flexion at the metatarsophalangeal joint was a bit restricted, probably by recurrent adhesions. Abduction of the thumb was diminished. For now, the patient needed to work a little more on massage as she was only

---

[4]"Distortion of any sense, especially that of touch." Dorland's Illustrated Medical Dictionary, 32nd ed., p. 577.

doing this about once a day.   She still had significant neuroma symptoms in the radial nerve which could require future neurectomy.   She was developing tightness of the extensor tendons of the thumb, consistent with recurrent adhesions." Id. ¶ 257.

On January 12, 2011, Dr. Amon, a non-examining consultant, completed a physical residual functional capacity evaluation.   Id. ¶ 310.   He noted "limited upper extremities" capacity for push and pull functions.   (AR at p. 550). His comment associated with this limitation was "Lue occ push/pull and freq hand ctrl." Id.   This comment is an indication of limited handling and fingering, unlimited reaching and no limitation of feeling in Ms. Hire's left hand. (Docket 14 ¶ 310).

After several more clinical visits, on February 15, 2011, Dr. Bellah operated on Ms. Hire's left wrist a third time.   Id. ¶ 286.   About one month later, Dr. Bellah reported Ms. Hire still had numbness, "neuroma pain," and "activities with thumb and hand will remain limited." Id. ¶¶ 293-94.   Dr. Bellah wrote "[i]t has been my observation that she has significant . . . . physical limitations . . . . These have included her significant dysfunction of the left hand and arm due to her tendinous adhesions, her tendon rupture, and neuroma formation.   This has resulted in a chronically painful hand which does not allow her to perform any significant grasping, lifting, pushing, or pulling and particularly any type of repetitive activities are severely limited." Id. ¶ 295.

On May 11, 2011, Dr. Bellah completed a physical residual functional capacity form.   Id. ¶ 313.   Dr. Bellah reported "severe limitation of use of dominant [left] hand [secondary to] neuroma, chronic adhesions to [left] [indecipherable] [with] weakness, pain, [decreased] ROM and lack of pinch."   Id. ¶ 314.   "[S]he should never lift 10 pounds, occasionally lift 10-15 pounds"[5] with "[n]o frequent or constant use of L. hand."   Id. ¶ 315.   He also noted "chronic L hand pain" and "L hand changes may be permanent and are very limiting . . . ." Id. ¶ 316.

On May 27, 2011, Dr. Pham, a second non-examining consultant, completed a physical residual functional capacity form.   He noted Ms. Hire's left wrist push and pull activities should be limited to "frequent."   Id. ¶ 317.   Dr. Pham's report identified Ms. Hire's left hand manipulative functions were limited for "Handling (gross manipulation)," "Fingering (fine manipulation)," and "Feeling (skin receptors)."   (AR at p. 656).   Disagreeing with Dr. Bellah's opinions, Dr. Pham wrote:

> 2/24/11 thumb motion good, neuroma pain significantly improved; 3/11 pinch and grip strength improved, fair thumb extension, finger motion good . . . Ortho/Dr. Bellah: 3/11 opines disability with noted neck, back pain, pain BLE [both lower extremities] in addition to LUE [left upper extremity]; this opinion is not given significant weight, no significant residuals from VA [vehicle accident] except left wrist, opinion is also not c/w [consistent with] ADLs [activities of daily living].

(Docket 14 ¶ 320).

---

[5]This conflict of permissible lifting limits is not explained in the administrative record or the joint statement of material facts.

Dr. Bellah wrote to Ms. Hire's former attorney on July 12, 2011.   Id.

¶ 325.   The letter specifically addressed, among other things, Ms. Hire's left hand injury and her chronic pain.   Dr. Bellah wrote:

> I have been treating her over a year now for her left hand injury . . . . I have no[w] performed approximately 3 operations on her to try to relieve her of the effects of this neuroma as well as repair of the tendon tear that was present to her thumb. None of these operations have been extremely successful. Though the tendon repair did take, she still has prolonged problems with the thumb due to chronic stiffness, weakness, and pain on motion.   The neuroma has been removed but she still has chronic diffuse pain to the radial side of hand and fingers that severely limits activities.   She is basically unable to use her left hand for any activity requiring pinching, grasping, twisting, pulling, pushing, and so on.   Any light contact to the skin over the dorsum of the wrist radially causes significant pain. . . . At the present time, I think Danielle does have a constellation of injuries that have resulted in significant difficulties performing any type of work, particularly anything that would require any type of manual work involving the left hand . . . .

Id.

The ALJ gave less weight to Dr. Bellah's medical opinions, making the following statements: "numerous medical opinions that the claimant is limited to occasional handling and fingering with her left hand, with the claimant being right hand dominant, and with the claimant's own reported activities of daily living.   The undersigned further noted that after the hearing, the claimant had grabbed a large clipboard with little difficulty before she exited the hearing room."   (AR at p. 18).   The ALJ also made the following comment regarding Ms. Hire's use of her left hand and wrist: "the claimant is able to drive an automobile and she plays with her child, each of which requires the use of her left hand."

Id.   The opinions of Dr. Bellah are consistent with the substantial evidence in the record and are entitled to controlling weight.   20 CFR § 404.1527(d)(2)); see also House v. Astrue, 500 F.3d 741, 744 (8th Cir. 2007) ("A treating physician's opinion is given controlling weight 'if it is well supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence.' ").   Despite the ALJ's best efforts to support his findings, there are no specific references to the record which provide a medical or legal basis to arrive at those conclusions.

The record discloses an extensive effort by Dr. Bellah, a board-certified orthopedic surgeon, to correct Ms. Hire's left wrist injuries.   At step two the ALJ should have evaluated whether Ms. Hire's left hand qualified as a "severe" impairment under 20 CFR § 404.1521(a) based on the medical record, not the ALJ's personal observations.

OBESITY

Because of the potential impact of obesity on Ms. Hire's claim of "severe" bilateral ankle impairment, the court must first address plaintiff's claim that the ALJ erred by not "consider[ing] obesity at step two."   (Docket 20 at p. 25).   The Commissioner's response did not specifically address obesity, but only argued the harmless or irrelevant issue status at step two.   (Docket 21 at pp. 6-8).

Social Security Ruling 02-1p "provides guidance on the evaluation of disability claims involving obesity . . . ."[6]  67 FR 57859.   The Ruling recognizes that "obesity is a complex, chronic disease characterized by excessive accumulation of body fat."  Id. at p. 57860.   Obesity is classified on the basis of body mass index ("BMI").   Id.   "BMI is the ratio of an individual's weight in kilograms to the square of his or her height in meters $(kg/m^2)$."  Id.   "For adults, both men and women, the Clinical Guidelines describe a BMI of 25-29.9 as 'overweight' and a BMI of 30.0 or above as 'obesity.' "  Id.   "When establishing the existence of obesity, [the agency] will generally rely on the judgment of a physician who has examined the claimant and reported his or her appearance and build, as well as weight and height.   Thus, in the absence of evidence to the contrary in the case record, [the agency] will accept a diagnosis of obesity given by a treating source or by a consultative examiner."  Id. at p. 57861.

Obesity is initially considered by an ALJ at step two.   Id. at p. 57861-62.
"As with any other medical condition, [the agency] will find that obesity is a 'severe' impairment when, alone or in combination with another medically determinable physical or mental impairment(s), it significantly limits an individual's physical or mental ability to do basic work activities."  Id.   The ALJ is directed to "also consider the effects of any symptoms (such as pain or fatigue)

[6]"Although Social Security Rulings do not have the same force and effect as the statute or regulations, they are binding on all components of the Social Security Administration, in accordance with 20 CFR 402.35(b)(1), and are to be relied upon as precedents in adjudicating cases."   SSR 02-1p, 67 FR at 57860.

that could limit functioning." Id. at p. 57862.   There is no specific level at which an ALJ must declare obesity to be a "severe" impairment.   "Rather, [the agency] will do an individualized assessment of the impact of obesity on an individual's functioning when deciding whether the impairment is severe."   Id.

The record discloses the following information.   At the time of the 2005 motor vehicle accident Ms. Hire was 5'4" tall and weighed 225 pounds.   (Docket 14 ¶ 96).   Ms. Hire's BMI was 38.[7]   The discharge summary identified obesity as one of Ms. Hire's principal health issues.   (AR at p. 334).   The November 6, 2005, medical summary likewise identified obesity as a major health issue.   Id. at p. 337; see also id. at p. 445.

On June 21, 2010, Ms. Hire was reported as 5'3", her weight as 224 pounds and her BMI as 40.   Id. at p. 490.   On September 1, 2010, the Mendocino Coast Clinic reported Ms. Hire as 5'4", her weight at 225 pounds and her BMI as 39.   Id. at p. 486.   On October 21, 2010, the same clinic reported Ms. Hire's weight at 225 pounds and her BMI as 38.   Id. at p. 483.   On March 30, 2011, Ms. Hire was reported as 5'4" and her weight at 217 pounds.   Id. at p. 636.   Ms. Hire's BMI was 37.[8]   On April 13, 2011, Ms. Hire was reported as 63" in height, her weight as 216 pounds and BMI as 30.   (Docket 14 ¶ 301). This calculation is in error, as Ms. Hire's BMI according to the National Institute

---

[7]See Body Mass Index Table 2, National Institute of Health ("NIH") http://www.nhlbi.nih.gov/health/educational/lose_wt/BMI/bmi_tbl2.htm, last visited May 6, 2015.

[8]See footnote 7 supra.

of Health BMI table would have been 37.[9]   In 2010, the Mendocino Coast Clinic

identified her as "overweight."   Id. ¶ 232.   The clinic described Ms. Hire as a

pleasant obese young lady.   Id. ¶ 301.

Regardless of the one inch variation in height measurement and the minor

fluctuations in Ms. Hire's weight, her BMI in the mid-to-high 30s places her in

"Level II" of the NIH Clinical Guides referenced in SSR Rule 02-1p.   Id. at

p. 57860.   Despite numerous references to Ms. Hire's obesity and BMI in the

record, the ALJ did not even mention obesity in the unfavorable decision.   (AR at

pp. 12-23).   The record supports a finding that Ms. Hire was medically classified

as obese.   The ALJ erred in not evaluating Ms. Hire's obesity and determining

whether her obesity was "severe" at step two.[10]

BILATERAL ANKLE IMPAIRMENTS

Ms. Hire argued the ALJ committed error by failing to designate her

bilateral ankle impairments as "severe."   (Docket 20 at p. 25).   She asserts

because of " 'chronic' grade 3 instability of ligaments of both ankles" which had

not been surgically corrected, "particularly in an obese individual, [which] would

necessarily impact on standing and walking activities, the ALJ should have

considered and found the impairments 'severe.' "   Id.

---

[9]See footnote 7 supra.

[10]Ms. Hire asked the Appeals Council to review the ALJ's failure to consider her obesity.   (AR at pp. 309-11).   Ignoring the directive of Social Security Ruling 02-1p, the Appeals Council affirmed the ALJ's decision.   Id. at pp. 1-4.

15

Following the 2005 motor vehicle accident, Dr. Klein described Ms. Hire's bilateral ankle instability as "chronic." (Docket 14 ¶ 156). Dr. Wettach reported "[a]ll ranges of motion in the ankle joints were decreased 25 percent." Id. ¶ 196. In 2011, the Mendocino Coast Clinic recorded bilateral ankle pain. Id. ¶ 284. This pain was to be addressed surgically after recovery from her wrist surgery was complete. Id. Ms. Hire's bilateral ankle instability has not been surgically corrected.

The ALJ found "[t]he record lacks evidence of gross anatomical deformity (e.g., subluxation, contracture, bony or fibrous ankylosis, <u>instability</u>) and <u>chronic joint pain</u> and stiffness with signs of limitation of motion or other abnormal motion of the effected joint(s), and findings on appropriate medically acceptable imaging of joint narrowing, bony destruction or ankylosis of the affected joint(s) with involvement of <u>one major peripheral weight-bearing joint</u> (i.e., hip, knee, or <u>ankle</u>) resulting in an inability to ambulate effectively . . . ." (AR at p. 15) (emphasis added). The finding of the ALJ ignores the record. This error is magnified by the failure of the ALJ to consider the impact of obesity on Ms. Hire's grade 3 bilateral ankle instability. SSR Rule 02-1p and polyarthralgia.

READING, MATHEMATICS AND WRITTEN EXPRESSIONS IMPAIRMENTS

Ms. Hire argues "[t]he ALJ failed to consider whether Hire's documented Reading Disorder, Mathematics Disorder, and Disorder of Written Expression

were 'severe' impairments." (Docket 20 at p. 26). The ALJ did not make any reference to these impairments in the unfavorable decision. (AR at pp. 12-23).

Dr. Thomas Atkin, a clinical psychologist, testified at the administrative hearing. (Docket 14 ¶ 17). Dr. Atkin testified Ms. Hire "was diagnosed with borderline intellectual functioning . . . ." Id. ¶ 21. Dr. Atkin would not respond to the question as to whether Ms. Hire was at a first or second grade level in reading, writing and math skills. Id. ¶¶ 22 & 23. At that point in the hearing, Ms. Hire presented the ALJ with a "CalWorks . . . learning needs assessments." Id. ¶ 24; see also AR at pp. 188-92. The document was faxed to Dr. Atkin. (Docket 14 ¶ 25).

The learning needs assessment conducted by the CalWorks Job Service in May 2010 involved achievement testing. Id. ¶ 212. Ms. Hire's academic functioning was reported as follows:

| CLUSTER | STANDARD SCORE | PERCENTILE RANK |
|---|---|---|
| Broad Reading | SS 67 | 1 |
| Word Identification | SS 53 | 1 |
| Reading Fluency | SS 73 | 4 |
| Reading Comprehension | SS 72 | 3 |
| | | |
| Broad Written Language | SS 59 | <1 |
| Spelling | SS 66 | 1 |
| Writing Fluency | SS 71 | 3 |
| Writing Sentences | SS 59 | <1 |
| | | |
| Broad Math | SS 70 | 2 |
| Calculation | SS 68 | 2 |
| Applied Problems | SS 76 | 5 |
| Math Fluency | SS 72 | 3 |

(AR at p. 191). In summary, the tester concluded "[w]hen compared to others at her age level [25] Danielle's academic skills are very low. When compared to others in her age level, Danielle's performance is low in mathematics and written language; and very low in broad reading, math calculation skills, and written language." Id. The tester recommended that Ms. Hire "[c]onsider employment that does not require in-depth memory skills." Id. at p. 192.

After being provided with the learning needs assessment, Dr. Atkin stated that a vocational expert would need to testify about whether retraining every day would be required. (Docket 14 ¶ 28). But, in Dr. Atkin's opinion, "those limitations are [not] documented in the record." Id.

Included in the record is a September 5, 2006, cognitive functioning evaluation conducted by Philip Cushman, Ph.D. (Docket 14 ¶ 165). Following testing, Dr. Cushman concluding Ms. Hire's word reading and sentence comprehension scores were first-grade equivalent and her spelling and math computation scores were at a second-grade equivalency. Id. ¶ 186. Among his other diagnosis, Dr. Cushman found she had a reading disorder, mathematics disorder and a disorder of written expression. Id. ¶ 190. Subsequent psychological testing done under the direction of Dr. Mandelbaum in 2011 reached the same conclusions. Id. ¶ 279; see also AR at pp. 556-60.

Ms. Hire's penmanship is barely readable and her spelling skills are atrocious. See AR at p. 330. Illustrative of her spelling skills is the following letter to her attorney:

18

> Dar Kater Ratlef
> Here a letter to anrer you Quasqers.
> We move to South dakata Aug-11
> I be seene Dordrer Casut then Dorer K. Jader MD and
> more in Lead Deadwood Renonal Medial Clinic
> After my accindit i did not work for about 1 1/2 till i
> was dunine from disubet. [denied for disability?]
> I had to look for work i had about 16 job and have be
> firer from then all but one. my fish job was with a
> firend, got firer about 2 month later! And the one job i
> work for about 4 month and I quit do to me and the
> Marnger talk and it was zezer for us if I quit my job.
> After we move to Sout Dakore I work for about 2 1/2
> month in a hotelHousekeepe And I was to was
> [unreadable, probably "fired"] do to notmakeing a bed
> do to it was to hard to do the job! and I was in to mech
> Pain.

(Docket 14 ¶ 124; <u>see</u> <u>also</u> AR at p. 330).

The court finds Dr. Atkin's conclusions are contrary to the substantial evidence in the administrative record and contrary to the clinical testing conducted. The ALJ erred by adopting Dr. Atkin's opinions and not addressing whether Ms. Hire's reading disorder, mathematics disorder and disorder of written expression were severe impairments.

<u>BRAIN ABNORMALITIES</u>

Ms. Hire argues the ALJ failed to consider her brain abnormalities of "multiple bilateral punctate hemorrhagic foci" and failed to classify this impairment as severe. (Docket 20 at p. 26).

In the 2005 head-on collision, Ms. Hire was diagnosed as having suffered a concussion. (Docket 14 ¶¶ 139-40). She reported having struck her "head really hard on the steering wheel." <u>Id.</u> ¶ 31. A brain CT at that time was

normal.   Id. ¶ 144.   The discharge summary reported Ms. Hire suffered a

"[c]losed head injury with negative CT for intracranial injury."   Id. ¶ 159.

During a psychological consultation in 2006, Ms. Hire "reported having

problems with memory since the accident, increased nightmares and irritability."

Id. ¶ 181.   Following testing, Dr. Cushing reported "[b]ordline mentally deficient

range . . . . suggesting difficulties with inductive reasoning involving the visual

modality . . . difficulties with attention and concentration."   Id. ¶ 182.   He

suggested "Ms Hire would benefit from more aggressive psychiatric treatment in

the form of both medications and, most importantly, supportive

psychotherapies.   A focused vocational program in the area of an unskilled

visual-motor task would be useful."   Id. ¶ 191.

In October 2009, Ms. Hire was admitted to a psychiatric unit for altered

mental status and "not speaking."   Id. ¶ 205.   A brain MRI disclosed the

existence of "mult[iple] bilateral punctuate [sic] hemorrhagic foci."[11]   Id. ¶ 323.

The neurology department reported "these MRI findings were unlikely to explain

her behavior.   It is possible that [Ms. Hire] was in a catatonic state or dealing w/

some posttraumatic stress."   Id. ¶ 205.

---

[11]"The term 'cerebral contusion' is used to indicate (punctate) hemorrhages within the brain parenchyma. . . . Less severe hemispheric DAI [diffuse axonal injury] can cause loss of telencephalic functions: decreased attention span, memory loss, concentration difficulties, lower IQ, headaches, seizures, less stress resistance, and behavioral changes. "   Diseases of the Brain, Head & Neck, Spine: Diagnostic Imaging and Interventional Techniques, p. 70, Gustave K. von Schulthess & Christopher Zollikofer, Springer, 2008.

Ms. Hire offers little assistance to the court in analyzing her challenge on this issue. Rather, she submits "[t]he issue is not separately raised because Hire's case is reversible on other grounds and the omission is correctable upon remand." (Docket 20 at p. 26 n.27).

Ms. Hire's traumatic brain injury may have caused deficiencies in memory and attention, both of which impact on a claimant's residual functional capacity. Ms. Hire's mother reported "a lot of memory loss and we have to explain to her over and over [h]ow to do things." (Docket 14 ¶ 117). Dr. Cushing's testing indicated difficulties with attention and concentration. Id. ¶ 182. Ms. Hire's working memory score placed her in the 2nd percentile which "clearly points to weaknesses in her ability to hold information in the brain long enough to process the input, analyze the information and then memorize it or produce a different result. . . . She showed very low short term memory and attention skills when asked to remember number sequences and reverse them in her head." Id. ¶ 217. The court finds the ALJ should have more closely analyzed the impact of Ms. Hire's brain injury in relationship to her residual ability to perform work related activities and in developing her residual functional capacity ("RFC").

In the final analysis, the court finds the Commissioner should have evaluated whether the five impairments qualify as "severe" pursuant to 20 CFR § 1521. The court does not accept the Commissioner's argument that "the ALJ's failure to find that a particular impairment was 'severe' does not constitute reversible error so long as the ALJ found that at least one other impairment was

severe." (Docket 21 at p. 6). The error by the ALJ is not "irrelevant." Id. at

p. 7. Failure to identify all of a claimant's severe impairments impacts not only

the ALJ's credibility findings, consideration of activities of daily living, but most

importantly, a claimant's RFC. "[F]ailure to consider plaintiff's limitations . . .

infect[s] the ALJ's . . . further analysis under step four." Spicer v. Barnhart, 64

Fed. Appx. 173, 178 (10th Cir. 2003). "Failure to consider a known impairment

in conducting a step-four inquiry is by itself, grounds for reversal." Id.

    The ALJ erred as a matter of law at step two of the sequential evaluation

process. The evidence not appropriately considered by the ALJ detracts from

the decision to deny disability benefits. Reed, 399 F.3d at 920.

### **STEP THREE**

    At step three, the ALJ determines whether claimant's impairment or

combination of impairments meets or medically equals the criteria of an

impairment listed in 20 CFR Part 404, Subpart P, Appendix 1 ("Appendix 1").

20 CFR §§ 404.1520(d), 404.1525, and 404.1526. If a claimant's impairment or

combination of impairments meets or medically equals the criteria for one of the

impairments listed and meets the duration requirement of 20 CFR

§ 404.1509, claimant is considered disabled.

    At step three, the ALJ found Ms. Hire did not have an impairment or

combination of impairments that met or medically equaled the severity of a listed

impairment in Appendix 1. (Docket 14 at ¶ 71; see also AR at p. 14). The ALJ

concluded "[t]he severity of the claimant's mental impairments, considered singly

[sic] and in combination, do not meet or medically equal the criteria of listings 12.02, 12.04, and 12.06." (AR at p. 15). The ALJ's references are to "organic mental disorders" [12.02], "affective disorders" [12.04] and "anxiety-related disorders" [12.06]. Appendix 1 ¶ 12.00(1)(A).

Ms. Hire argues she is presumptively disabled because her combined impairments equal a listed impairment. (Docket 20 at p. 27) (citing 20 CFR § 404.1520(a)(4)(iii)). Ms. Hire claims "her combined impairments equals Listing 12.05C." Id.

The introduction to Appendix 1 Mental Disorders explains how Listing 12.05, Intellectual disability,[12] is evaluated.

> Listing 12.05 contains an introductory paragraph with the diagnostic description for intellectual disability. . . . For paragraph C, we will assess the degree of functional limitation the additional impairment(s) imposes to determine if it significantly limits your physical or mental ability to do basic work activities, i.e., is a "severe" impairment(s), as defined in §§ 404.1520(c) and 416.920(c). If the additional impairment(s) does not cause limitations that are "severe" as defined in §§ 404.1520(c) and 416.920(c), we will not find that the additional impairment(s) imposes "an additional and significant work-related limitation of function," even if you are unable to do your past work because of the unique features of that work. . . .

Id. The introductory paragraph of Listing 12.05 referenced above states:

---

[12]The *Diagnostic and Statistical Manual of Mental Disorders*, fifth edition, replaced the term "mental retardation" with "intellectual disability." The regulations adopted this change. See White Thunder v. Colvin, 5:13-cv-5036-JLV (Docket 27 at p. 7 n.5). When a witness, report or case uses the term "mental retardation" the court will use that term, otherwise the court will use the term "intellectual disability."

Intellectual disability refers to significantly subaverage general intellectual functioning with deficits in adaptive functioning initially manifested during the developmental period; i.e., the evidence demonstrates or supports onset of the impairment before age 22. The required level of severity for this disorder is met when the requirements in A, B, C, or D are satisfied.

Appendix 1, Listing 12.05. The requirements of subsection C are as follows:

A valid verbal, performance, or full scale IQ of 60 through 70 and a physical or other mental impairment imposing an additional and significant work-related limitation of function . . . .

Id. A claimant satisfies the 12.05C criteria by showing: "(1) a valid verbal, performance, or full scale IQ score of 60 through 70, (2) an onset of the impairment before age 22, and (3) a physical or other mental impairment imposing an additional and significant work-related limitation of function." McNamara v. Astrue, 590 F.3d 607, 611 (8th Cir. 2010) (internal quotation marks and citation omitted) (referencing Appendix 1 § 12.05C).

Ms. Hire acknowledges that she does not satisfy the 12.05C criteria because her lowest IQ score is a verbal IQ of 73. (Docket 20 at p. 28). However, she argues by application of "POMS-DI 24515.056 Evaluation of Specific Issues—Mental Disorders—Determining Medical Equivalence" and considering Ms. Hire's "additional and significant work-related limitations of function," she "equals" the criteria for 12.05C. Id. The Program Operations Manual System states that "slightly higher IQs (e.g. 70-75) in the presence of other physical or mental disorders that impose additional and significant work-related limitations

of function may support an equivalence determination."   Shontos v. Barnhart, 328 F.3d 418, 424 n.7 (8th Cir. 2003).

Medical equivalence can be found if the medical findings are "at least equal in severity and duration to the criteria of any listed impairment."   20 CFR § 404.1526(a).   An impairment is "medically equivalent" to a Listing where (1) the claimant has a listed impairment but does not have one of the required findings, or the finding is not as severe as required, but the claimant has other findings related to the "impairment that are at least of equal medical significance to the required criteria"; (2) the claimant's impairment does not appear in the Listings but is "at least of equal medical significance to those of a listed impairment"; or (3) the claimant has a combination of impairments, "no one of which meets a listing," but the impairments in combination "are at least of equal medical significance to those of a listed impairment."   20 CFR § 404.1526(b). The determination of whether a particular medical condition meets or equals a Listing is a medical judgment made at the initial and reconsideration stages of administrative review by the Commissioner's designated physicians and consultative medical specialists.   20 CFR § 404.1526(e).

Eugene Campbell, Ph.D., a Division of Disability Services non-examining consultant, completed a Psychiatric Review Technique form on February 14, 2011.   (Docket 14 ¶ 311; AR at pp. 561-74).   Dr. Campbell also completed a Mental Residual Functional Capacity Assessment form.   (Docket 14 ¶ 312; AR at pp. 575-78).   For purposes of the Psychiatric Review Technique, Dr. Campbell

considered Listings 12.02, organic mental disorders; 12.04, affective disorders; 12.05, intellectual disability; and 12.06, anxiety-related disorders. (Docket 14 ¶ 311; AR at p. 561). Under the analysis for organic mental disorders, Dr. Campbell indicated Ms. Hire had "[a] medically determinable impairment . . . that does not precisely satisfy the diagnostic criteria . . . [of] reading, writing and math d/o [disorder]." (AR at p. 561). However, under Listing 12.05 for mental retardation, Dr. Campbell did not mention Ms. Hire's "reading, writing and math d/o" as a potential impairment which may be of equal medical significance, but rather he noted "BIF [borderline intellectual functioning]." (AR at p. 565).

On November 6, 2012, Dr. Atkin also completed a Psychiatric Review Technique form. (Docket 14 ¶ 326; AR at pp. 680-94). Dr. Atkin did not consider Listing 12.05, intellectual disability. (Docket 14 ¶ 326; AR at pp. 680 & 690). Rather, Dr. Atkin included "Borderline Intellectual Functioning" as a "medically determinable impairment is present that does not precisely satisfy the diagnostic criteria . . ." for Listing 12.02, organic mental disorders.[13] (Docket 14 ¶ 326; AR at p. 681). As mentioned above, Dr. Atkin apparently was not even aware of Ms. Hire's diagnoses for disorders involving reading, mathematics and writing. He also insisted those disorders were not present in the record—a

---

[13]The Commissioner asserts Dr. Atkin's consideration of Listing 12.02 was appropriate because "[a]n organic mental disorder involves loss of previously acquired functional abilities etiologically related to a specific organic factor." (Docket 21 at p. 12 n.6) (referencing Appendix 1, Listing 12.02). This argument ignores the undisputed evidence that Ms. Hire's IQ is only three points outside the criteria established for Listing 12.05 and, when considered with her other severe impairments, may place her in a medical equivalency under 12.05.

declaration which was proven to be inaccurate by the administrative record references above.

There is no evidence Dr. Campbell or Dr. Atkin considered the impact of the combination of Ms. Hire's verbal IQ of 73 and the severe impairments— polyarthralgia, depression and anxiety/posttraumatic stress disorder found by the ALJ or the other impairments which the court determined must be re-evaluated by the ALJ for a determination of severity: left forearm and hand, obesity, and reading, mathematics and writing disorders—in determining whether they constitute a "medical equivalence" for purposes of Listing 12.05.

More important, the ALJ did not discuss Listing 12.05. The court finds the ALJ erred in relying on the incomplete opinions of Dr. Atkin and Dr. Campbell in determining whether Ms. Hire's severe impairments met or equaled a Listing. If Ms. Hire satisfies step three, she is automatically determined to be disabled and is entitled to benefits.

**STEP FOUR**

Before considering step four of the evaluation process, the ALJ is required to determine a claimant's RFC. 20 CFR § 416.920(d). RFC is a claimant's ability to do physical and mental work activities on a sustained basis despite any limitations from her impairments. 20 CFR 404.1545(a)(1). In making this finding, the ALJ must consider all of the claimant's impairments, including those which are not severe. 20 CFR §§ 404.1545(e) and 416.945(e). All of the

relevant medical and non-medical evidence in the record must be considered. 20 CFR §§ 416.945(a)(3), 416.912(a), and 416.929.

In determining a claimant's RFC, the ALJ considers any medical opinions and claimant's degree of functional limitation. 20 CFR §§ 416.927(a)(1) and (d). "Medical opinions are statements from physicians and psychologists or other acceptable medical sources that reflect judgments about the nature and severity of [claimant's] impairment(s), including [claimant's] symptoms, diagnosis, and prognosis, and what [claimant] can still do despite the impairment(s), and . . . physical or mental restrictions." 20 CFR § 416.927(a)(2). In weighing medical opinion evidence, the ALJ must consider the factors set forth in the regulations. 20 CFR § 416.927(d).

The next step in the analysis of mental impairments requires a determination as to the "degree of functional limitation resulting from the impairment(s)." 20 CFR §§ 404.1520a(b)(2) and 416.920a(b)(2). Rating of functional limitation evaluates the extent to which impairment "interferes with [claimant's] ability to function independently, appropriately, effectively, and on a sustained basis." 20 CFR §§ 404.1520a(c)(2) and 416.920a(c)(2).

Because of the errors at step two, the ALJ's RFC determination is defective. Failure to identify all of a claimant's severe impairments impacts not only the ALJ's credibility findings and consideration of activities of daily living but, most importantly, a claimant's RFC. This constitutes reversible error. Spicer, supra.

28

Ms. Hire's obesity may also have an impact at step four of the sequential process. SSR 02-01 directs that an ALJ should consider the following:

> Obesity can cause limitation of function. The functions likely to be limited depend on many factors, including where the excess weight is carried. An individual may have limitations in any of the exertional functions such as sitting, standing, walking, lifting, carrying, pushing, and pulling. It may also affect ability to do postural functions, such as climbing, balance, stooping, and crouching. The ability to manipulate may be affected by the presence of adipose (fatty) tissue in the hands and fingers. The ability to tolerate extreme heat, humidity, or hazards may also be affected.

> The effects of obesity may not be obvious. . . . Obesity may also affect an individual's social functioning.

> An assessment should also be made of the effect obesity has upon the individual's ability to perform routine movement and necessary physical activity within the work environment. Individuals with obesity may have problems with the ability to sustain a function over time. As explained in SSR 96-8p ("Titles II and XVI: Assessing Residual Functional Capacity in Initial Claims"), our RFC assessments must consider an individual's maximum remaining ability to do sustained work activities in an ordinary work setting on a regular and continuing basis. A "regular and continuing basis" means 8 hours a day, for 5 days a week, or an equivalent work schedule. In cases involving obesity, fatigue may affect the individual's physical and mental ability to sustain work activity. . . . .

> The combined effects of obesity with other impairments may be greater than might be expected without obesity. . . .

(SSR 02-01p ¶ 8; 67 Fed. Reg. 57862-63).

These step four errors also impact the ALJ's step five determination. See O'Leary v. Schweiker, 710 F.2d 1334, 1343 (8th Cir. 1983) (hypothetical questions posed to vocational experts must precisely set out all claimant's

impairments).   "Testimony elicited by hypothetical questions that do not relate with precision all of a claimant's impairments cannot constitute substantial evidence to support the Secretary's decision."   Pratt v. Sullivan, 956 F.2d 830, 836 (8th Cir. 1992) (citing Ekeland v. Bowen, 899 F.2d 719, 722 (8th Cir. 1990)).

## ORDER

Based on the foregoing discussion, the court finds the matter should be remanded for further proceedings consistent with this order.   Accordingly, it is

ORDERED that plaintiff's motion to reverse the decision of the Commissioner (Docket 19) is granted.

IT IS FURTHER ORDERED that, pursuant to sentence four of 42 U.S.C. § 405(g), the case is remanded to the Commissioner for rehearing consistent with the decision set out above.

Dated September 2, 2015.

BY THE COURT:

/s/ *Jeffrey L. Viken*
JEFFREY L. VIKEN
CHIEF JUDGE